FORBES LITHOGRAPH MANUF'G Co. *v.* WORTHINGTON.

*(Circuit Court, D. Massachusetts.  January 8, 1886.)*

CUSTOMS DUTIES—IRON SHOW-CARDS—PRINTED MATTER—ACT OF MARCH 3, 1883, SCHEDULE C, and SCHEDULE M.

Iron show-cards, printed on plates of sheet-iron from lithographic stones, on hand-presses, in the same way that lithographing is done on paper or cardboard, are not "printed matter" within the meaning of the statute, (act of March 3, 1883, Schedule C,) but are liable to a duty of 45 per cent. *ad valorem,* under Schedule M, of the act of March 3, 1883, as a manufacture of iron not specially enumerated in the act.

At Law.

*Selwyn & Bowman,* for plaintiff.

*George P. Sanger,* U. S. Dist. Atty., for defendant.

CLARK, J.  This case was submitted by the parties on an agreed statement of facts, from which it appeared that the plaintiffs, a corporation located at Boston, in the district of Massachusetts, imported into that port by different steamers, in 10 different lots, certain merchandise described in the invoices and entries as "iron show-cards." These cards were prepared in different colors on plates of sheet-iron. They were lithographed, or printed from lithographic stones, on hand-presses, in the same way that lithographing is done on paper or on card-board.  On this merchandise,—that is, on these "iron show-cards,"—as described in the invoices, the defendant, as collector of the port of Boston, exacted a duty of 45 per centum *ad valorem,* ($2,432.62,) under the act of March 3, 1883, Schedule C, last clause or paragraph, (22 St. 501,) which is thus:

"Manufactures, articles, or wares, not specially enumerated or provided for in this act, composed wholly or in part of iron, steel, copper, lead, nickel, pewter, tin, zinc, gold, silver, platinum, or any other metal, and whether partly or wholly manufactured, forty-five per centum *ad valorem.*"

The importers, the plaintiffs, claimed that the goods or merchandise was subject to a duty of 25 per centum *ad valorem* only, ($1,351.20,) under the same act of March 3, 1883, Schedule M, first paragraph, (22 St. 510,) as follows:

"Books, pamphlets, bound or unbound, and all printed matter, not especially enumerated or provided for in this act, engravings, bound or unbound, etchings, illustrated books, maps, and charts, twenty-five per centum *ad valorem.*"

Against this assessment of duties the plaintiffs protested, claiming —*First,* that the articles were not liable to any duty, being of no commercial value; and, *secondly,* that, if dutiable at all, a duty of 25 per centum *ad valorem* only should have been assessed upon them, as "printed matter," and not 45 per centum, as manufactures of iron.

The agreed state of facts finds that these articles were of a certain commercial value, so that the first claim of the protest, that they

were of no commercial value, and therefore not dutiable, may be passed by.

Two questions then remain: (1) Were these cards "printed matter," within Schedule M of the act of March 3, 1883? And (2) if they were not, were they properly assessed 45 per centum *ad valorem* as manufactures of iron?

That the cards were lithographed, or printed as lithographing is done on paper or card-board, is agreed in the statement of facts. But here the printing was done on iron sheets or plates, and the question is whether such lithographing requires such sheets or plates to be classified as "printed matter," in the proper construction of the act of March 3, 1883. It was urged in the argument that the substance or surface on which the printing was done could make no difference in the fact that it was "printed matter;" and, in a certain limited sense, this is true. Printing may be impresssd on iron, on wood, on leather, cloth, and other material, — and that may be called "printed matter." But that is not decisive of the question here. The question is not the narrow one,—whether there was printing on these cards; but the broader one,—whether they were such "printed matter" as fairly to fall within the scope of Schedule M of the act of March 3, 1883.

In *Maillard* v. *Lawrence*, 16 How. 261, Mr. Justice DANIEL, in delivering the opinion of the court, said:

"The popular or received import of words furnishes the general rule for the interpretation of public laws as well as of private and social transactions; and, wherever the legislature adopts such language, in order to define or promulge their action or their will, the just conclusion from such a course must be that they not only themselves comprehended the meaning of the language they have selected, but have chosen it with reference to the known apprehension of those for whom it is designed to constitute a rule of conduct,— namely, the community at large."

The same rule was recognized in *Greenleaf* v. *Goodrich*, 101 U. S. 285, and other cases.

Applying this rule to the expression "printed matter," it must be held that congress used it in its popular sense,—in its common acceptation, as it was understood in the community at large; and, if so, there can be included in it only such matter as is generally known as "printed matter." The word "print" has a wide range of signification; but its ordinary meaning is to impress letters, figures, and characters, by types and ink of various forms and colors, upon paper of various kinds, or some such yielding surface. *Arthur* v. *Moller*, 97 U. S. 367. So, I apprehend, the ordinary meaning of "printed matter" is paper, or some other like substance, commonly used for the purpose, printed in the ordinary or usual way. Such matter as is usually printed,—all such. That congress used the phrase in this popular sense, is made further evident by an examination of the connection in which it is found in various statutes. In the act of March 2, 1861, (12 St. at Large, 187,) the language is: "In all books, periodicals,

and pamphlets, and all printed matter and illustrated books, and papers," associating printed matter with books, periodicals, pamphlets, illustrated books, and papers,—and thus indicating the meaning and application of the phrase to a similar kind of "printed matter." So the phrase is used in the act of June 30, 1864, (13 St. at Large, 218;) so in Rev. St. (1st Ed. 477; 2d Ed. 474;) and so in the act of March 3, 1883, (22 St. at Large, 510.) It is uniformly associated with books, pamphlets, periodicals, engravings, and the like "printed matter," and its meaning and scope may be very satisfactorily known by its context, "*noscitur a sociis.*" There is no evidence before me that cards, such as are the subject of controversy in this case, are known commercially as "printed matter." Nor is there any evidence that they are known or recognized as such by printers, book-binders, sellers, or dealers in pamphlets or periodicals or papers, or by any other persons. It is sought to include them under the term "printed matter" because they are lithographed, lithographing being held as printing; but I do not think this can avail to class them with such matter as is ordinarily known as "printed matter." The invoice is more nearly correct in describing them as "iron show-cards."

The next question is, if these cards were not dutiable as "printed matter," was a duty of 45 per cent. *ad valorem* properly assessed upon them as a manufacture or article, in whole or part of iron, not specially enumerated or provided for in the act of March 3, 1883. It is very clear these articles or cards were a manufacture. They had been brought by hand-labor or machinery from pig-iron, and other raw material, to their present form and condition. It is equally clear they were in part of iron. They do not appear to have been specially enumerated or provided for in the act of March 3, 1883. As a manufacture of iron, simply, they are small sheets of iron; but, with the additional work upon them, they can hardly be classed as such in the common or commercial designation as sheet-iron.

It was contended at the hearing of this case that the principle involved in it was fully settled in the case of *Arthur* v. *Jacoby,* 103 U. S. 677. But it seems to me this case is clearly distinguishable from that. In *Arthur* v. *Jacoby,* the duty of 50 per centum *ad valorem* was assessed upon the merchandise, as upon "china, porcelain, or parian ware," while the evidence showed—leaving no doubt—that the article was not an article of china ware, but simply a ground for painting, manufactured as such to obtain a smooth ground. And if not china ware, clearly the duty could not be levied on them as such. "Confessedly," says Chief Justice WAITE, in the opinion, "the goods were paintings done by hand." As such a duty of 10 per cent. was ordered upon them.

I do not find in this case that the goods were confessedly "printed matter;" or that they were so known commercially; or in the common acceptation of the language of the act; or that they were dutiable as such. But I do find that they were a manufacture of iron,

in part, not specially enumerated in the act of March 3, 1883, above referred to, and subject to a duty of 45 per centum *ad valorem.* The case is, in some of its aspects, a close one, and one in which a difference of opinion might be entertained; but as the burden of proof is upon the plaintiffs (*Arthur* v. *Unkart*, 96 U. S. 118) to show the illegality complained of, and they have not been able to do it, judgment must be rendered for the defendant for costs, as in the case agreed.