## ALPERS v. UNITED STATES.
### No. 12157.

United States Court of Appeals
Ninth Circuit.

May 31, 1949.

Hone & Lobree and Haskell Titchell, San Francisco, Cal., for appellant.

Frank J. Hennessy, U.S. Atty., Daniel C. Deasy, Jr., Assst. U.S. Atty., San Francisco, Cal., for appellee.

Before DENMAN, Chief Judge, and BONE and ORR, Circuit Judges.

ORR, Circuit Judge.

Appellant was convicted on two counts of an information charging him with knowingly depositing with the Railway Express Agency, for carriage in interstate commerce, certain obscene phonograph records. This, according to the Government's theory, constitutes a violation of certain of the provisions of 18 U.S.C.A. § 396 [now § 1462].

That the phonograph records were deposited for carriage in interstate commerce is admitted; that there was inscribed thereon obscene matter is also admitted.

The question for determination is: Are the provisions of 18 U.S.C.A. § 396 broad enough to include phonograph records? The statute, insofar as it is material here, reads: "Whoever shall * * * deposit * * * with any express company * * * for carriage from one State * * * to any other State * * * any obscene, lewd, or lascivious, or any filthy book,

**138**

pamphlet, picture, motion picture film, paper, letter, writing, print, or other matter of indecent character, * * * ".

It is appellant's contention that by enumerating particular classes of obscene matter, Congress evinced a clear intention of limiting the application of the statute and of the general words employed therein, relying on the rule that where a statute employs specific words enumerating specific classes, modes or species, the statute should be construed as being limited in operation and not all-inclusive in scope. The Government admits this rule should be applied in construing the statute under consideration but insists that a proper application thereof demonstrates conclusively that it, 18 U.S.C.A. § 396, prohibits the shipment in interstate commerce of phonograph records impressed with recordings of obscene, lewd, lascivious and filthy language. In approaching a consideration of the questions involved in this case we should keep in mind that the rule of strict construction must be applied and that the doctrine of ejusdem generis is particularly applicable to criminal cases. United States v. Salen, 235 U.S. 237, 35 S.Ct. 51, 59 L.Ed. 210; First National Bank of Anamoose v. United States, 8 Cir., 206 F. 374, 46 L.R.A.,N.S., 1139. Had Congress intended the statute to be all-inclusive it very readily could have eliminated mention of the special classes and employed the general words "any obscene or indecent matter". The title of the Act at the time of enactment is some indication of the true intention of the Congress in enacting § 396. It read: "Importing and transporting obscene books." This is not controlling but does point up the fact that in all probability Congress intended only a prohibition against the transportation of obscene literature.

A rule of value sometimes employed in construing a statute is to construe it with reference to the evil it was designed to suppress, this in the event "the language * * * is ambiguous and equally susceptible of conflicting constructions. But * * * this rule does not apply to instances which are not embraced in the language employed in the statute, or implied from a fair interpretation of its con-

text, even though they may involve the same mischief which the statute was designed to suppress." United States v. Chase, 135 U.S. 255, 10 S.Ct. 756, 758, 34 L.Ed. 117. The use of phonograph records to transmit obscene matter involves the same mischief which the statute is designed to suppress. It is matter of indecent character, but is entirely different from the methods enumerated.

Two prime methods can be employed in communicating obscene matter to the human mind—visual and auditory representations. This may be accomplished by graphic and lingual representations which may be used with or without mechanical assistance. Prior to 1920 the prohibited matter in the statute fell within the broad classification of visual representation. However, as scientific discoveries progressed it became evident that all visual representations were not ejusdem generis with the species mentioned in § 396 because the enumeration there made required no mechanical contrivance to render them susceptible of being read or observed. Congress, in 1920, added the words "motion-picture film" and in doing so very properly considered that motion-picture film was not within the classification theretofore mentioned in the statute. The motion-picture film is a succession of photographs on a film. The word "photograph" is a combination of the Greek words photos, meaning light, and graphos, meaning writing, and a photograph is a light writing. By the amendment of 1920 the photographic motion picture film was added to a statute theretofore containing the word writing. By the amendment Congress demonstrated that the word writing, as used in the statute before 1920 was not so used in its broadest sense. Such being the case the question is immediately posed: Why the omission, at the time of the amendment, to mention obscene phonograph records if they be not within the statutory prohibition?

The word "phonograph" is a combination of the Greek words "phone", meaning sound, and graphos, meaning a writing; hence, a phonographic disc is a sound writing. The word writing, as used in the statute before 1920, not being sufficiently broad to include light writing it certainly did not include sound writing. It seems to us the

reason Congress did not include sound writing in the 1920 amendment was because it was thinking solely in terms of visual representation. Motion picture film at that time had no sound track attachment and was visual representation.

Appellee ingeniously argues that visual representations could not have been the only methods which Congress had in mind when enacting the statute because by use of the Braille system, books are written for use of the blind and certainly the statute contains the word book. We are not impressed with the argument because the probability of finding the evil designed to be suppressed in the Braille system of communication is so extremely remote that it cannot be said to weigh against our conclusion that Congress was thinking only in terms of visual representation. Whether or not a book of that character conveying obscene matter would be a violation of the statute we do not decide.

The Government, in its analysis of § 396, and as a justification of its position that obscene phonograph records are within the prohibition of the statute, points to the word print used therein. The Government argues that a phonograph record is a print within the broad meaning of the term. It cites dictionary definitions in support of such an argument.

In the case of United States v. Harman, D.C., 38 F. 827, 829, the court, in discussing the meaning of the word print used in the statute banning obscene matter from the mails, 18 U.S.C.A. § 334, [now § 1461], asks the question: "What is meant by print?" and answers by stating that undoubtedly, in its broadest sense it may be an impression of either figures, characters, or letters. In its more common sense it is used as applicable to letters."

"It is not necessary, however, that the characters produced should be letters or numerals, or the result of types or stereotypes, or be reading matter, but the term print or printing includes the most of the forms of figures or characters or representations, colored or uncolored, that may be impressed on a yielding surface." Arthur v. Moller, 97 U.S. 365, 367, 24 L.Ed. 1046.

"Printing means the impress of letters or characters upon paper or upon other substance * * * [and] implies a mechanical act." Daly v. Beery, 45 N.D. 287, 178 N.W. 104, 106.

"The word 'print' has a wide range of signification; but its ordinary meaning is to impress letters, figures, and characters, by types and ink of various forms and colors, upon paper of various kinds, on some such yielding surface." Forbes Lithograph Mfg. Co. v. Worthington, C.C., 25 F. 899, 900.

The method of producing a phonograph record, as we understand it, is accomplished by a needle cutting the non-resistant surface of a wax disc.[1] After this operation is completed that which is recorded is not understandable until produced as sound through a mechanical device and thus conveyed to the senses in a manner so radically different from that of imparting to the senses the meaning and contents of prints ordinarily associated with the printing art that one cannot say there is not a reasonable doubt that Congress intended to include them. The rule of strict construction requires a holding that phonograph records are not included in the word print.

What we have said disposes of the contention that phonograph records come within the meaning of the term "or other matter of indecent character." To do so would require a holding that the word "matter" relates to a class or species enumerated in the statute. The only class or species to which it would belong, according to the government's contention, would be those covered by the word "print". We have held that the word "print" does not include phonograph records. The general term "or other matter of an indecent character" is not all-inclusive.

Judgment reversed.

---

[1] Copies are produced from a mold made from the original recording but the requirement of mechanical assistance in order that the recorded matter may be imparted to the senses remains.